**UNITED STATES OF AMERICA,**

v.

**Daniel EMMENEGGER, Defendant.**

**No. 04 CR. 334(GEL).**

United States District Court, S.D. New York.

Aug. 4, 2004.

---

Scott L. Marrah, Assistant United States Attorney, New York, NY (David N. Kelley, United States Attorney for the Southern District of New York, of counsel), for U.S.

Jennifer L. Brown, The Legal Aid Society, Federal Defender Division, New York, NY, for defendant Daniel Emmenegger.

## SENTENCING OPINION

LYNCH, District Judge.

The most pressing legal question in federal criminal law at this moment is whether the Supreme Court's recent decision in *Blakely v. Washington,* — U.S. —, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), invalidates all or significant parts of the sentencing guidelines regime introduced by the Sentencing Reform Act of 1984, Pub.L. No. 98–473, 98 Stat.1987. This Court has not yet been required to address that question. Either defense counsel or the Government, or both, have sought adjournments in cases pending sentence when the Supreme Court decided *Blakely,* and the Court has routinely granted such adjourn-

ments to provide the parties time to absorb the opinion and reassess their arguments about appropriate sentences in view of it.

The time has now come for the Court to face the question, for it is squarely presented by this case. Of course, district courts will play a limited role in the ultimate resolution of the issues raised by *Blakely*. But they do not enjoy the luxury to await guidance from the Supreme Court; they must move forward with processing the many criminal cases before them, applying the law as best they can determine it. This case provides a classic occasion to address the main questions with which the federal courts have wrestled since *Blakely*.

## BACKGROUND

On April 16, 2004, defendant Daniel Emmenegger, an employee of a registered securities broker-dealer, pled guilty to a five-count indictment charging him with securities fraud and wire fraud. The Government had charged Emmenegger with a fairly simple scheme to defraud his employer, Susquehanna International Group, LLP. As an employee of Susquehanna, Emmenegger had been authorized to trade index options. Between July 2002 and March 2004, he repeatedly engaged in trades between Susquehanna's proprietary account and accounts under his personal control, on terms different from prevailing market prices, in a manner that caused his accounts to gain and Susquehanna's to lose. The Government alleges that Emmenegger's scheme occasioned losses of more than $300,000.

It is the Government's proclaimed policy to refuse to enter into sentencing stipulations short of the highest readily-provable range under the U.S. Sentencing Guidelines ("U.S.S.G" or "Guidelines"). *See United States v. Green*, No. Cr. A. 02–

10054, 2004 WL 1381101, at *6 (D.Mass. June 18, 2004), citing Sept. 22, 2003, Memorandum from Attorney General John Ashcroft Setting Forth Justice Department's Charging and Plea Policies § I.A, *reprinted in* 16 Fed. Sent. Rep. 129 (2003). Like many defendants in recent years, Emmenegger therefore chose simply to plead guilty to the entire indictment, without either receiving promises from the Government or stipulating to any facts beyond those necessary to furnish an adequate factual basis for his plea. At his plea allocution, when the Court asked Emmenegger what he had done to make him believe himself guilty of the crimes charged in the indictment, his entire response was as follows:

> From the summer of 2002 through early 2004 while working both as a trading assistant and market maker; I made off-market trades at prices to my own advantage. Through these trades I caused my employer to lose money and gain[ed] money for my own accounts.
>
> I was in Manhattan at the time I executed those trades and sent confirmation orders to Connecticut where I had set up accounts that my employer was unaware of.
>
> At the time that I executed these trades I knew that what I was doing was wrong and illegal and I'm ashamed of myself right now for doing this.

(Tr. 16.) The Government agreed that this statement provided an adequate factual basis for his plea, subject only to Emmenegger's confirmation, in response to a follow-up question suggested by the prosecutor, that he transmitted the interstate confirmations "[e]lectronically," over wires. (*Id.*) Neither the Court nor the Government asked Emmenegger about, nor did he specify, the extent of the unlawful

trades or the magnitude of the consequent losses.[1]

Consistent with prevailing practice in the Second Circuit, *see United States v. Pimentel,* 932 F.2d 1029, 1034 (2d Cir. 1991), the Government provided Emmenegger with a letter setting forth its understanding, as of the time of the plea, of the applicable sentencing analysis pursuant to the Guidelines. Before Emmenegger entered his plea, the Court advised him that this letter neither binds the Court nor constitutes a "guarantee or promise that [his] sentence would be within [the] range" specified by the Government (Tr. 14), and that "by pleading guilty [he was] exposing himself to the possibility of receiving any combination of punishments up to the maximum" sentence of 20 years on each count, or "up to 100 years [of] imprisonment" (Tr. 11). Emmenegger acknowledged that he understood this advice. (Tr. 12, 14.)

According to the Government, pursuant to U.S.S.G. § 2B1.1(a)(1), Emmenegger's base offense level is seven, which must be increased by four additional levels because the offense involved a violation of the securities laws and Emmenegger was associated with a broker-dealer at the time of the offense, U.S.S.G. § 2B1.1(b)(14)(A)(ii), and by twelve more levels because the aggregate loss was between $200,000 and $400,000. U.S.S.G. § 2B1.1(b)(1)(G).

Awarding Emmenegger credit for timely acceptance of responsibility would reduce his offense level by three, U.S.S.G. §§ 3E1.1(1)(a) and (b), yielding, by the Government's calculation, an adjusted final offense level of 20 (7 + 4 + 12—3). Because the parties agree that Emmenegger has no prior criminal record, the sentencing range, according to the Government's calculation, should be 33—41 months of imprisonment. On July 13, 2004, the Probation Department provided the Court with a Presentence Report ("PSR"), which adopted the same calculation and recommended that Emmenegger be sentenced at the bottom of that range.

The Court must address the constitutionality of the guidelines regime only if it makes a practical difference here. Accordingly, the Court will first determine Emmenegger's sentence under three different, potentially applicable, sentencing regimes.

## SENTENCING CALCULATIONS

### I. *Sentencing Guidelines*

Were the Court to use the guidelines regime universally applied by federal courts before *Blakely,* it would reach the same conclusion arrived at by the Government and the Probation Department. The guidelines analysis is straightforward, for

---

1. It is far from clear that the Court could or should have asked further questions and elicited more information about Emmenegger's crimes. Rule 11 of the Federal Rules of Criminal Procedure requires only that the court "determine that there is a factual basis for the plea"; it does not even specify that this factual basis must come from the defendant's own mouth, still less require the court to cross-examine the defendant with a view to eliciting damning details beyond those necessary to establish that (1) the defendant understands the elements of the offense, and (2) a sufficient factual basis exists to find the defendant guilty of that offense. Fed. R.Crim. P.

11(b)(3). Whether defendants enjoy a Fifth Amendment privilege to decline to answer such detailed questions is unclear. *See United States v. Cruz,* 156 F.3d 366 (2d Cir.1998) (safety-valve requirement of disclosure of other crimes does not violate Fifth Amendment); *but see United States v. Oliveras,* 905 F.2d 623 (2d Cir.1990) (defendant may not be denied acceptance of responsibility credit for asserting Fifth Amendment right to decline to answer questions concerning other crimes to which he did not plead guilty). In any event, the Court asked, and Emmenegger answered, all the questions necessary to make his plea valid.

it requires resolution of only one disputed guidelines issue and a decision on one arguable ground for departure.

### A. Offense Level: "Person Associated with a Broker or Dealer"

While Emmenegger argues that *Blakely* renders the guidelines regime unconstitutional, and that the Guidelines therefore should not be applied to his case at all (Letter from Jennifer L. Brown, to the Court, dated July 16, 2004, at 1 ("Brown Ltr.")), he offers an alternative analysis under the Guidelines in the event the Court rejects that argument. (*Id.* at 9.) Emmenegger's analysis effectively concedes that his base offense level is seven, and that the Court could correctly find by a preponderance of the evidence that his offense caused an aggregate loss within the range asserted by the Government.[2]

■ Emmenegger does, however, dispute the four-level adjustment imposed pursuant to U.S.S.G. § 2B1.1(b)(14)(A)(ii). This section enhances a sentence for a fraud or theft crime if the offense involves a violation of the securities laws and the offender is "a person associated with a broker or dealer." *Id.* Emmenegger pled guilty to securities fraud, thus establishing the first prerequisite to this enhancement. The Guidelines commentary makes clear that "a person associated with a broker or dealer" is a term of art defined by the securities regulation statutes. U.S.S.G. § 2B1.1, Application Note 13(A). The referenced definition applies the term to, among others,

> any employee of such broker or dealer, except that any person associated with a broker or dealer whose functions are solely clerical or ministerial shall not be included in the meaning of such term for purposes of 78o(b) of this title (other than paragraph (6) thereof).

15 U.S.C. § 78c(a)(18).

Emmenegger argues that this definition does not apply to him because, at least during the portion of his employment when he held the title "trading assistant,"[3] his job was "essentially ministerial or clerical in nature." (Brown Ltr. at 9.) The Court rejects that characterization, for both legal and factual reasons.

First, as a matter of law, the statutory definition of "a person associated with a broker or dealer" *includes* clerical or ministerial employees, except with regard to one particular aspect of the securities laws, which is not implicated here. The primary definition covers "*any* employee of [a] broker or dealer." 15 U.S.C. § 78c(a)(18) (*emphasis added*). The only exception does not remove clerical or ministerial employees from the definition of associated persons generally; the statute makes an exception for clerical or ministe-

---

**2.** The determination of loss in this case is quite simple. The only victim is Susquehanna, Emmenegger's employer. Trading records unequivocally document the trades Emmenegger made on behalf of Susquehanna in which his own accounts were the designated counter-parties; the extent to which such trades departed from the market price can be *readily ascertained from indisputable sources;* and the resulting gains to Emmenegger, and corresponding losses to his employer, can be derived mathematically from these facts. But the simplicity and precision of this calculation is by no means typical of fraud cases; in many fraud cases, as the case law and the

Guidelines make clear, the extent of the loss presents extremely complex questions, and in many instances, the loss amount must simply be estimated. *See* U.S.S.G. § 2B1.1, Application Note 3; *United States v. Shonubi,* 895 F.Supp. 460, 474–75 (E.D.N.Y.1995) (collecting cases); *vacated on other grounds,* 103 F.3d 1085 (2d Cir.1997).

**3.** Susquehanna promoted the defendant, during the course of his criminal activities, to "market maker." (Brown Ltr. at 9, PSR ¶ 28.)

rial employees *solely for purposes of 15 U.S.C. § 78o(b).* Indeed, the statutory language emphasizes that employees exempt from the definition for those limited purposes are persons who have already been defined as "person[s] associated with a broker or dealer" for all other purposes. *Id.* The effect of the "clerical or ministerial" exception is therefore simply to exempt employees in that category from certain requirements of § 15(b) of the Securities Exchange Act of 1934, which deal, among other things, with the registration of broker-dealers and the qualifications required of associated persons. *See, e.g.,* 15 U.S.C. §§ 78o(b)(2)(A), (7). Clerical and ministerial employees fall within the definition for all other purposes, specifically including that portion of § 15(b) that deals with discipline of broker-dealer employees.

Here, the crime did not involve a violation of § 15(b), but of § 10(b) of the Act and Rule 10b–5 of the corresponding federal regulations. (Indt., Count I.) Nothing in the definition of associated persons or in any other law exempts clerical and ministerial employees of broker-dealers from complying with that rule. Indeed, the statutory inclusion of such employees within the definition of associated persons for purposes of § 15(b)(6) specifically author-

izes the Securities and Exchange Commission to censure, suspend or bar such employees who violate, inter alia, § 10(b). *See* 15 U.S.C. §§ 78o(b)(6)(A); 78o(b)(4)(D), (E).

Second, even if Emmenegger performed only clerical or ministerial duties while he held the title of trading assistant,[4] he does not contend that he continued to be exclusively a clerical or ministerial employee after being promoted to "market maker" in January 2003. (Brown Ltr. at 9.) By his own sworn admission, Emmenegger's fraudulent scheme continued into "early 2004" (Tr. 16), and two of the wire fraud counts to which he pled guilty involved trades in December 2003 (Indt., Counts IV, V), by which time he occupied a more responsible position. Moreover, Emmenegger admitted in a presentence interview that he "continued to engage in the criminal activity" after being promoted." (PSR ¶ 28.) The offense conduct for purposes of sentencing thus includes acts Emmenegger committed at a time when he does not even contend that he falls within the exception. Because the offense characteristics to which the guidelines adjustments apply include not only "the offense of conviction," but "all relevant conduct," U.S.S.G. § 1B1.1, Application Note 1(H),

---

**4.** It is not clear that Emmenegger's duties could be characterized as "solely clerical or ministerial" even during his term of employment as a trading assistant. The very facts of this offense demonstrate that while Emmenegger held that title, he engaged in trades on behalf of Susquehanna, a duty that can hardly be described as "clerical or ministerial." The PSR emphasizes that while Susquehanna employed Emmenegger as a trading assistant, he "repeatedly caused Susquehanna's proprietary account to buy or sell index options at unfavorable, off-market prices" (PSR ¶ 15; *see also id.* ¶ 14), and two counts of wire fraud to which Emmenegger specifically pled guilty involved trades that he executed while working as a trading assistant. (Indt., Counts II, III.) Emmenegger asserts that he lacked au-

thorization to execute any trades at all without authorization from the trader he was assigned to, and that his duties with respect to trades were limited to ministerial execution. (S. Tr. ___.) The record does not clearly refute this contention, nor does it disclose the full range of duties of a trading assistant. Even assuming *arguendo* that his duties as a trading assistant were *"essentially* ministerial or clerical in nature" (Brown Letter at 9; emphasis added), his ability to execute trades on the firm's account calls into question any conclusion that his duties were *"solely* clerical or ministerial,"* as required to come within the exception. In light of the other reasons for rejecting Emmenegger's objections to this enhancement, it is unnecessary to resolve this dispute.

the challenged enhancement would apply even assuming, *arguendo,* that Emmenegger correctly interprets the definition of "a person associated with a broker or dealer" and accurately describes his duties as a trading assistant as solely clerical or ministerial.

For all of these reasons, the 4–level enhancement under U.S.S.G. § 2B1.1(b)(14)(A)(ii) applies here. Because Emmenegger does not challenge any other aspects of the calculation of his offense level, and the Government agrees that Emmenegger timely accepted responsibility for purposes of U.S.S.G. § 3E1.1, the adjusted offense level of 20, as calculated by the Probation Department, is correct.

**B.  *Departure: Character and Remorse***

■  Emmenegger also argues that the Court should depart from the applicable guidelines range pursuant to U.S.S.G. § 5K2.0(a)(2)(B), on the ground that he has a fundamentally good character and has shown extraordinary remorse. The Court declines to depart on this ground because the facts do not warrant such a departure.

While some members of Congress and journalists occasionally seem to misunderstand the concept, a sentencing departure does not constitute a subversion of the Sentencing Reform Act or of the guidelines system. In fact, notwithstanding the shorthand terminology sometimes applied, a departure is not a departure "from the guidelines"; it is a departure from *the otherwise applicable guideline range.* Both the governing statute and the Guidelines themselves specifically authorize sentencing courts to "depart from the applicable guideline range," U.S.S.G. § 5K2.0(a)(1), if "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into

consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b)(1).

The history of the Sentencing Reform Act and the Guidelines commentary demonstrate that departures were intended to play a vital role in the operation of the guidelines system, first, by informing the Sentencing Commission of factors not adequately considered in the Guidelines that could be the subject of future amendments; and second, by providing sentencing courts an opportunity to adjust sentences to the infinite variety of individual circumstances that no system of guidelines could conceivably take into account. *See Koon v. United States,* 518 U.S. 81, 92–94, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996); U.S.S.G. § 1A1.1, Editorial Note, Ch. I, Part A, § 4(b). At the same time, the power to depart is not an open-ended invitation to judges to adjust sentences to suit their individual sense of justice. *See id.* ("[T]he Commission believes that despite the courts' legal freedom to depart from the guidelines, they will not do so very often. This is because the guidelines, offense by offense, seek to take account of those factors that the Commission's data indicate made a significant difference in pre-guidelines sentencing practice."). Every judge who tries to apply the Guidelines in good faith understands and appreciates the difference between, on the one hand, identifying factors *overlooked by* the Commission that may warrant a sentence different from that specified by the otherwise applicable guidelines range, and on the other, articulating reasons why the court respectfully *disagrees with* the weight given by the Commission to different factors that the Commission has taken into account—or declined to take into account—in determining the Guideline range. Inevitably, borderline cases will arise in which

reasonable people will disagree about whether a particular sentencing argument falls on one side or the other of that line. But the line itself is both meaningful and well understood by nearly all federal judges.

The factors on which Emmenegger relies do not warrant a departure in this particular case. Any reason the Court might have for concluding that Emmenegger's sentence should be lower than that dictated by the applicable guideline range is not one that has not been taken into account by the Commission.

Emmenegger cites a number of cases in which judges have departed from the applicable Guideline range on grounds that could be characterized as recognition of the offender's good character, exceptional degree of remorse, rehabilitation or restitutionary efforts. Mindful of the broad scope of a court's power to depart in appropriate circumstances, the Court not only does not categorically reject these grounds as illegitimate considerations, but even assumes *arguendo* that in an appropriate case, such factors would warrant a departure. Nevertheless, the nature of such grounds require that they be approached with extreme caution. The Commission has clearly considered whether sentences should be based in any substantial way on either quantifiable or subjective assessments of a defendant's overall personality or character, and it has determined, rightly or wrongly, that the primary determinant of punishment should be the seriousness of the offense, rather than the defendant's broader moral worth. The Guidelines take the latter element into account explicitly, and almost exclusively, by the weight they give to the defendant's prior criminal convictions. The Guidelines also permit a departure where the crime is "aberrant" in light of the defendant's prior life. U.S.S.G. § 5K2.20. Emmenegger

does not and cannot contend that he meets the requirements of this provision. Similarly, a defendant's remorse has been taken into account, albeit in a less moralistic sense, by an adjustment for "acceptance of responsibility," U.S.S.G. § 3E1.1, for the most part as tangibly expressed by a plea of guilty.

In short, the factors relied on by Emmenegger cannot be deemed factors "of a kind . . . not adequately taken into consideration" by the Commission. Are they nevertheless present here "to a degree" not adequately accounted for by the Guidelines? This Court cannot in good conscience answer that question in the affirmative. As for character, Emmenegger is a first offender whose record reflects no previous misconduct. Yet many otherwise decent, upstanding citizens commit property crimes in response to financial pressure or simply out of greed. The Guidelines take this into account in setting the level of punishment applicable to first offenders. More than a history of unremarkable but law-abiding behavior, and conformity to middle-class standards of decency, is required to demonstrate "extraordinary" character that could warrant a downward departure for first-time offenders who have committed a white-collar property crime.

The Court has carefully reviewed and reflected on the heartfelt letters and testimonials submitted by Emmenegger's friends and family. They clearly demonstrate love and compassion for Emmenegger, and a person of fundamentally corrupt or criminal character would presumably find it difficult to compile such letters. But the vast majority of defendants who come before this Court as youthful offenders without long records of criminal conduct (and even many of those who *do* have deplorable records) continue to receive the love and support of their families and

friends. Many, in turn, love their families and friends, show kindness to animals, participate in charitable activities, and generally make their parents proud. Few resemble the defendants in *United States v. Merritt*, 988 F.2d 1298 (2d Cir.1993), or *United States v. Cusack*, 66 F.Supp.2d 493 (S.D.N.Y.1999), whose characters were so reprehensible as to suggest a *higher* sentence than that provided by the applicable guideline.

While it is unclear what kind of behavior would demonstrate a character so extraordinary as to warrant a downward departure, little in Emmenegger's history can be marshaled in support of an argument that his character meets that standard. Without implying any limits on the kind of behavior that could indicate an extraordinary character deserving of such a departure, it must be noted that Emmenegger has never volunteered for hazardous duty, displayed physical courage on behalf of others, or shown moral strength by taking an unpopular stand as a matter of principle. That is not to criticize him; few would meet that standard, and as a young man of 26, Emmenegger has had few opportunities to demonstrate outstanding moral attributes or face unusual dangers or temptations. But that is precisely the point: Showing extraordinary character requires conduct beyond the norm. Far from being a profile in courage, Emmenegger yielded to greed in his first full-time job after college. He engaged in a scheme to defraud his employer over a period of more than one year. Virtually every employee in the financial services industry faces temptations to certain kinds of criminal conduct. This test of character is not particularly stringent, and most such employees pass. Emmenegger flunked.

Nor has Emmenegger exhibited any extraordinary degree of remorse. Once caught, he pled guilty promptly, apologized, and expressed shame at his criminal conduct, and the Court has no reason to doubt the sincerity of these sentiments. Emmenegger also has sought psychological help, which he hopes will steer him clear of future misconduct. But however commendable these responses, far from being extraordinary, they remain typical of many, probably most, white-collar offenders of Emmenegger's class and educational background.[5] Nothing extraordinary about his character, conduct or expression of remorse, which his sentence reduction for timely acceptance of responsibility already takes into account, justifies consideration of a downward departure.

Accordingly, the Court finds no factors in the case sufficient to justify a departure from the applicable guidelines range.

### C. *Conclusion*

The applicable guideline sentencing range is 33—41 months. While the Court finds no reason to depart, neither does it find any reason to impose a sentence above

5. Emmenegger also urges the Court to consider that as a Swiss national, he could have hidden his conduct from his family and friends abroad, and carried on with a financial career at home as if nothing had happened, but that he instead chose to confront the consequences of his criminal conduct by admitting his guilt not only to the Court, but to family and friends. (Brown Ltr. at 11.) This argument appears unrealistic. It seems entirely natural that a person arrested and jailed in a foreign country would reach out to family and friends for practical and moral support. Nor does it seem at all likely that significant financial institutions would fail to pursue sufficient due diligence to uncover the facts behind a resume gap of several years or to seek references from a former employer. The Court therefore does not regard the facts that Emmenegger reached out to his family and friends abroad, or that he decided that a career in finance, in the United States or in Switzerland, is now closed to him, as relevant to assessing the degree of his remorse.

the bottom of that range. Accordingly, applying the law of the guidelines regime, the Court would sentence Emmenegger to 33 months' imprisonment.

## II. *Sentencing Guidelines Applied to Admitted Facts Only*

The severity of the guidelines sentence is almost entirely attributable to facts found by the Court by a preponderance of the evidence, based on hearsay, that is, on information collected and reported by the Government and the Probation Department, not evidence examined directly by the Court after being introduced, following the establishment of a proper foundation, at a formal hearing. No jury found these facts; there has been no jury trial. Nor did Emmenegger admit them at his plea allocution, whether by stipulation or testimony.

Emmenegger pled guilty to conceiving a scheme to defraud his employer in connection with securities transactions, and executing that scheme by wiring confirmation notices across state lines. Those admitted facts suffice to establish his guilt of wire and securities fraud, and to support a base offense level under the Guidelines of seven. But they do not suffice to establish the factor that most significantly drives the severity of the guidelines sentence in this case: the twelve-level upward adjustment for the amount of loss. A person can be guilty of wire or securities fraud without causing any loss at all, for the essence of both crimes lies in the defendant's conduct, not in his or her success in harming the intended victim. Nothing in Emmenegger's plea allocution indicates that his crime caused losses in excess of $200,000, nor, for that matter, $5000, the amount required for any loss-related enhancement at all.[6]

Hence, were the Court not authorized to engage in judicial fact-finding but constrained to calculate Emmenegger's sentence solely on the basis of facts charged in the indictment and admitted by the defendant during his allocution or found by a jury beyond a reasonable doubt, then, after deducting the adjustment for acceptance of responsibility,[7] Emmenegger's total offense level would be either five (yielding a guidelines range of 0—6 months), or, at most nine (yielding a sentencing range of 4—10 months). It is, of course, because the Guidelines require the Court to impose an additional enhancement based on facts *not* admitted or found by a jury that Emmenegger contends that the sentence called for by the Guidelines may not con-

---

**6.** The allocution comes closer to establishing the four-level enhancement for a securities crime committed by a person associated with a broker-dealer. Emmenegger specifically pled guilty to securities fraud and admitted to being employed "as a trading assistant and market maker." (Tr. 16.) But he did not explain his duties, or describe his employer as a registered broker-dealer, for these facts remain irrelevant to his guilt of the crimes charged. Perhaps the Court could infer the necessary facts from his allocution: It must be assumed that when Emmenegger pled guilty to defrauding his "employer," he was referring to Susquehanna, the entity named as his employer in the indictment, and the Court could perhaps take judicial notice that Susquehanna is registered with the Securities

and Exchange Commission as a broker-dealer. Emmenegger's status as an employee of such an entity suffices, for the reasons set forth above, to render him a "person associated with a broker or dealer" for purposes of this case. It is unnecessary, for present purposes, to decide whether this adjustment would or would not be applicable based solely on facts admitted at Emmenegger's guilty plea.

**7.** Under this scenario, Emmenegger would receive only a two-level reduction for acceptance of responsibility because the total offense level would be less than 16. *See* U.S.S.G. § 3E1.1(b).

stitutionally be imposed consistent with *Blakely.*

### III. *Discretionary Sentencing*

Because *Blakely* casts constitutional doubt on the continuing validity of the guidelines regime, it is appropriate for the Court to consider what sentence it would impose were it not required to follow the Guidelines, but permitted instead to impose sentence, in its best judgment and discretion, somewhere within the statutory limits for the offenses of conviction, mindful of the statutory objectives of sentencing that Congress has directed the courts to consider. *See* 18 U.S.C. § 3553(a). In this case, those statutory limits provide no real constraint at all. None of Emmenegger's offenses carries a statutory mandatory minimum sentence, so the minimum term of imprisonment is zero.[8] And because the Court could impose consecutive sentences for the five counts of conviction, each of which carries a maximum sentence of 20 years' imprisonment, the maximum possible term of incarceration, as the Court advised Emmenegger at the time of his plea (Tr. 11), would be 100 years.

After nearly two decades of Guideline sentencing, which followed decades of criticism of the unconstrained discretion that culminated in the Sentencing Reform Act,[9] it is doubtful that any federal court would be comfortable wielding such extraordinary discretion. But under present law, the Court's discretion would hardly be unconstrained. At a minimum, the Court would be required to justify its sentence in light of the objectives enumerated by Congress in 18 U.S.C. § 3553(a). Moreover, rational judges would seek guidance not solely in their personal sense of justice, or in the abstract, general principles laid out by statute, but in the collective judgment of their peers and of institutions that have sought to develop a logical structure for guiding their discretion, such as the Sentencing Commission. Paying appropriate deference to the Guidelines would both direct the Court to undoubtedly appropriate factors to consider in imposing sentence, and at the same time help to control the problem of disparity, by providing a fixed reference point for all judges in exercising their discretion.

To be sure, under a restored discretionary system, judges would undoubtedly depart somewhat more from the sentences prescribed by the Guidelines.[10] But the use of the Guidelines as *guidelines*—that is, as an advisory system of principles that both (1) sets a general level of severity of sentences deemed appropriate by a judicious body of politically-responsible experts, and (2) creates a methodology and enumerates factors to be applied to assess the seriousness of criminal conduct and the severity of an offender's criminal record—would be a significant step toward controlling unwonted disparity and giving meaningful structure to the exercise of discretion. Whatever *Blakely*'s implications for the guidelines regime, that decision casts no doubt on the constitutionality of those portions of 18 U.S.C. § 3553(a) that direct courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" by Congress in

---

**8.** Title 18 U.S.C. § 3561(a) authorizes a sentence of probation because the offenses here qualify as Class C felonies. *See* 18 U.S.C. § 3559(a)(3) (defining Class C felonies).

**9.** *See especially* Marvin E. Frankel, *Criminal Sentences: Law Without Order* (1972).

**10.** If the Guideline system cannot constitutionally be applied as written, as a mandatory system that grants judges limited authority to depart, then it cannot constitutionally be applied *sub rosa*, by courts slavishly following, as a matter of ostensible discretion, the dictates of an unconstitutional system.

that section and to "consider" the sentencing range established by the Sentencing Commission for the offense in question.

Applying these principles here, the Court would sentence Emmenegger to 24 months' imprisonment, rather than to the 33 months suggested by the Guidelines, based primarily on the factors set forth in 18 U.S.C. §§ 3553(a)(2)(A) (the need for sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense") and (B) ("to afford adequate deterrence to criminal conduct"). These factors call for a meaningful period of incarceration for a crime such as this one. Emmenegger breached the trust of his employer and stole a substantial amount of money. That is a serious crime. To permit such an offender to avoid meaningful incarceration, while jailing thieves and other non-violent offenders of lower social status, would trivialize the seriousness of white-collar offenses. Furthermore, because many employees of financial institutions have the opportunity to commit similar offenses, and likewise find themselves subject to the temptations of those who handle large sums of money, a reasonably substantial term of incarceration is also appropriate to deter others similarly situated.

The message of the Sentencing Guidelines supports this conclusion. The Guidelines suggest, correctly, that securities fraud by employees of broker-dealers is a crime that warrants particular deterrent attention and requires a prison sentence for any such employees who steal a substantial amount of money. The Guidelines, and the congressional directives that underlie them, therefore reflect a strong social policy against any sentencing philosophy that would award probationary sentences to persons in Emmenegger's position because of their lessened likelihood of recidivism or strong potential for rehabilitation.

Other aspects of the guidelines scheme, however, are more questionable. The Guidelines place undue weight on the amount of loss involved in the fraud. This is certainly a relevant sentencing factor: All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment. But the guidelines provisions for theft and fraud place excessive weight on this single factor, attempting—no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes—to assign precise weights to the theft of different dollar amounts. In many cases, including this one, the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence. To a considerable extent, the amount of loss caused by this crime is a kind of accident, dependent as much on the diligence of the victim's security procedures as on Emmenegger's cupidity. Had Emmenegger been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more. Nothing about the offense indicates that Emmenegger set out to steal $300,000, no more and no less. Rather, he took advantage of his position to steal various amounts from time to time. The rough magnitude of the theft is relevant to sentencing, but the particular amount stolen is not as significant. Moreover, the Guidelines already consider the potential for a large-scale loss to some extent by providing an enhancement for a securities fraud by a person associated with a broker-dealer. Were less emphasis placed on the overly-rigid loss table, the identification of different types of fraud or theft offenses of greater or lesser moral culpability or danger to society would per-

haps assume greater significance in assessing the seriousness of different frauds.

Moreover, while the Guidelines appropriately steer the Court toward a significantly punitive and deterrent sentence, and counsel against giving undue weight to other factors, they err in giving virtually no weight to the "history and characteristics of the defendant," which Congress instructs the sentencing courts to consider equally with "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). No factor in the offense-level calculation addresses these characteristics, and the sentence computation as a whole takes into account only the defendant's history of convictions, not the full scope of the offender's "history and characteristics." In this case, a fact-sensitive assessment of the need "to protect the public from further crimes of the defendant," one of the factors that Congress has instructed the courts to consider, 18 U.S.C. § 3553(a)(2)(C), is conspicuously absent from the Guidelines.

Fair consideration of that factor indicates that there is less need for incarceration to protect the public from future crimes committed by this defendant than is typical in cases of theft. This conclusion is not based merely on Emmenegger's status as a first offender, which the Guidelines take into account, or on a prediction of his future good behavior. Unlike defendants whose crimes require no special skill or position, Emmenegger yielded to a temptation and committed a crime particularly adapted to his chosen career. That career is over, and his potential to commit this particular type of crime has been eliminated.

Moreover, Emmenegger is not a United States citizen. He will be deported after serving his sentence. Unlike many alien offenders, Emmenegger entered the United States legally, held a valid visa, and emigrated from a country that is not a source of substantial illegal immigration into the United States. It is therefore highly unlikely that he will sneak back into this country illegally to commit additional crimes. Finally, the evidence relied upon by Emmenegger in seeking a departure from the guidelines range, while insufficient to warrant a reduced sentence under the stringent standards for departure under the guideline system, is relevant to assessing his likelihood of recidivism and the lack of a need for rehabilitative services for the defendant. *See* 18 U.S.C. § 3553(a)(2)(D). The defendant's relative youth and inexperience reinforce this low likelihood of further criminality. Emmenegger is young with respect to his exposure to the business world, yet relatively old for a first-time offender. He is old enough to have a meaningful record of previous good behavior, but young enough to be given a second chance. While the Guidelines discourage the use of age as a reason for departure, U.S.S.G. § 5H1.1, it is entirely rational to consider this factor in setting a sentence in the Court's discretion.

Overall, a sentence of two years' imprisonment seems adequate to serve the purposes of punishment in this case, without imposing an excessive punishment, with its attendant costs in governmental expense and lost liberty and productivity of the offender. The sentence is also of the same general level of magnitude as that provided in the Guidelines; it can hardly be said that a sentence of two years rather than two years and nine months disrespects the policies underlying the Guidelines or undermines deterrence. At the same time, the sentence takes more fully into account the true nature of the offense and the offender, and a reduction of nine months provides a meaningful benefit to the defendant. Accordingly, under a discretionary

regime with advisory guidelines, the Court would impose a sentence of 24 months' imprisonment.[11]

## LEGAL DISCUSSION

Because application of the Guidelines results in a higher sentence than the Court *would* impose under a discretionary system, or that the Court *could* impose were it forbidden to find facts that could result in an increased sentence, the Court must decide whether the application of the Guidelines under these circumstances is constitutional.

### I. *The Directly Applicable Precedents*

At the threshold, the Court is keenly aware of the presence of binding circuit authority. While many courts and commentators have formulated the question before the Court as whether *Blakely* invalidates the fact-finding system embodied in the Guidelines, *Blakely* itself is simply an elaboration of the principle set forth in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The Second Circuit has already held that *Apprendi* does not render the Guidelines unconstitutional. *United States v. Luciano*, 311 F.3d 146 (2d Cir.2002). This Court must follow that precedent unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit. The precise question for this Court, then, is not whether, by its own analysis, *Blakely*'s reasoning supports a finding that the Guidelines are unconstitutional; it is whether *Blakely* so conclusively supports that finding that the Second Circuit or the Supreme Court is all but certain to overrule *Luciano*.

This Court cannot conclude that the holding of *Blakely* inevitably entails the unconstitutionality of the Guidelines. In *Blakely*, the Supreme Court expressly reserved the question of the consistency of the Guidelines with *Apprendi*, 124 S.Ct. at 2538 n. 9 ("The Federal Guidelines are not before us, and we express no opinion on them.") The Supreme Court itself thus apparently viewed the issues in *Blakely*, which involved the State of Washington's statutory sentencing scheme, as sufficiently distinct from those concerning the Guidelines to be worth reserving elaboration of the impact of its decision on federal sentencing law for a later day. That later day is close at hand, as the Court has granted certiorari on the issue. *United States v. Booker*, No. 04–104, 2004 WL 1713654 (Aug. 2, 2004).

Moreover, although the Court has never addressed, with specific reference to the Guidelines, the precise jury trial right implicated by *Blakely* and *Apprendi*, it has, without a murmur of constitutional qualm, previously affirmed sentences that would appear to present the very concerns that some now argue invalidate the Guidelines. *See, e.g., Edwards v. United States*, 523 U.S. 511, 118 S.Ct. 1475, 140 L.Ed.2d 703 (1998) (court may impose higher sentence based on judge's finding that conspiracy involved crack-cocaine, whatever the jury's views; unanimous decision); *United States v. Watts*, 519 U.S. 148, 117 S.Ct. 633, 136

---

**11.** In setting this particular length of imprisonment as satisfying the Court's analysis of the factors relevant to sentencing, the Court takes account not merely of the facts to which the Guidelines direct attention, but also of the overall level of severity proposed by the Guidelines. While any individual judge might prefer an overall more lenient or more severe table of punishments, a principal value of the Guidelines is in freeing defendants from disparities created by such preferences, and providing benchmarks for what society as a whole, and judges in particular, consider the appropriate scale of punishment for different degrees of crime.

L.Ed.2d 554 (1997) (court may impose higher sentence based on "relevant conduct" found by judge by a preponderance of the evidence, despite jury's acquittal of defendant on counts charging such conduct); *Witte v. United States*, 515 U.S. 389, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995) (court may impose higher sentence based on conduct not charged in the indictment); *United States v. Dunnigan*, 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993) (court may enhance sentence based on judge's finding by a preponderance of the evidence that defendant committed perjury at trial; unanimous opinion). It is, to say the least, questionable whether the Court has recently discovered a constitutional principle rendering unconstitutional all the sentencing practices affirmed in those decisions, all of which were decided within approximately a decade before *Blakely*.

Guidance from the intermediate appellate courts is equally unclear. While most courts of appeals that have considered the issue have held that *Blakely* dooms the Guidelines, *United States v. Booker*, 375 F.3d 508 (7th Cir.2004), *cert. granted*, 2004 WL 1713654 (Aug. 2, 2004); *United States v. Mooney*, 02-3388, 2004 WL 1636960, at *12-*13 (8th Cir. July 23, 2004); *United States v. Ameline*, 376 F.3d 967 (9th Cir. 2004); *United States v. Montgomery*, No. 03-5256, 2004 WL 1562904 (6th Cir. July 14, 2004), *vacated and reh'g en banc granted*, 2004 WL 1562904 (6th Cir. July 19, 2004), *case dismissed*, 2004 WL 1637660 (6th Cir. July 23, 2004), that conclusion has hardly been unanimous. *See United States v. Pineiro*, 377 F.3d 464 (5th Cir. 2004); *Booker*, 375 F.3d at 515-20 (Easterbrook, J., dissenting).

Closer to home, rather than *provide* guidance to the district courts, the Second Circuit has chosen to *seek* guidance from the Supreme Court, by certifying two questions on the viability of the Guidelines after *Blakely*. *United States v. Penaranda*, 375 F.3d 238 (2d Cir.2004). Subsequent actions by the Circuit indicate its apparent intention to withhold further comment until the Supreme Court answers its plea. *See United States v. Jasper*, No. 03-1720, 2004 WL 1682884 (2d Cir. July 28, 2004) (summary order; deferring consideration of sentencing issues pending Supreme Court action); *United States v. Lenoci*, 377 F.3d 246 (2d Cir.2004) (affirming conviction and sentence but withholding mandate in light of *Penaranda*). These cases certainly indicate doubts about the continuing validity of *Luciano;* at the same time, the Second Circuit is evidently not so convinced that *Blakely* overruled *Luciano* as to make that decision without guidance from the Supreme Court.

Under these circumstances, it would be bold indeed for a district court simply to declare itself free of binding authority and to hold invalid a comprehensive sentencing scheme adopted by Congress and applied by the federal courts, including the Supreme Court, for nearly twenty years, particularly where not a single constitutional challenge to that scheme has ever been sustained.

## II. The Apprendi Case Law

Predicting the outcome of the *Blakely /Apprendi* challenge to the Guidelines is made more difficult by the surprising volatility and intense controversy surrounding this line of cases. Part of the problem lies in the tenuousness of the critical distinction between "offense elements" and "sentencing factors" as measures of a defendant's culpability.[12] The conventional

---

12. The author of this opinion addressed this problem at length before he was on the bench and before *Apprendi* was decided. Gerard E. Lynch, *Towards a Model Penal Code, Second*

wisdom before *Apprendi*, drawn in part from the Supreme Court's decision in *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), and in part from the law of discretionary sentencing that predated the sentencing reforms of the 1980s, *see Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), held that the elements of the charged offense needed to be proved to the jury beyond a reasonable doubt, but that factors that bore only on the sentence to be imposed for the offense, within the limits of the discretion confided to the courts, needed only to be proved to the satisfaction of the sentencing judge.[13]

The problem with this distinction is that it is essentially a formalistic one. Both "offense elements" and "sentencing factors" are factual propositions that help determine the defendant's degree of culpability, but their identification as one or the other depends on how the legislature chooses to characterize them. For example, the crime of "statutory rape" traditionally has been defined as sexual intercourse with a person below a certain age. Arguably, statutory rape is less severe to the extent that the perpetrator is close in age to the victim. A legislature inclined to accept that argument might set a high maximum sentence for the crime, and leave it to judges to use their discretion to impose a lesser penalty in cases where both perpetrator and victim were very young, and a higher sentence in cases where an older adult has exploited a younger child. In that case, the ages of the parties would be mere "sentencing factors." Any factual dispute about the matter would be for the judge to resolve in the course of imposing sentence. Alternatively, a legislature that felt strongly about the matter might divide the crime of statutory rape into several distinct offenses. New York, for example, defines three degrees of this variant of rape, with different age differentials.[14] In such a case, the ages of the parties constitute an element of the offense that must be proved to the jury beyond a reasonable doubt. But in either case, the significance of the parties' relative ages is a matter that goes to the seriousness of the offense, and that will ultimately affect the severity of the punishment imposed.

Before the advent of sentencing guideline systems and widespread mandatory minimum sentences, the Supreme Court's decision in *Apprendi* would likely have been entirely uncontroversial. In that case, the judge imposed a sentence higher than the maximum penalty provided for the offense of conviction, based on a factual finding of discriminatory motivation that (pursuant to a separate statute) authorized an enhanced sentence for any crime. Consider the common state-law pattern of de-

*(Federal?); The Challenge of the Special Part,* 2 Buff.Crim. L.Rev. 297 (1998).

**13.** The term "sentencing factor" seems to make its very first appearance in a Supreme Court decision in *McMillan*. Under the broad judicial discretion over sentencing that dominated early and middle twentieth century sentencing systems, there was hardly a need for the term; since no one other than the court that was imposing sentence specified what facts were relevant to sentencing decisions, the "factors" going to the sentence were more amorphous. The Court in *Williams* spoke only of the "information" or "evidence" that could be used by the sentencing court in determining an appropriate sentence.

**14.** *See* N.Y. Penal Law §§ 130.25 (rape in the third degree; intercourse between person over 21 and person under 17); 130.30 (second degree; perpetrator over 18 and victim under 15; affirmative defense if age differential less than four years); 130.35 (first degree; victim under 11 or victim under 13 and perpetrator over 18).

fining separate crimes of grand and petit larceny, with the distinction turning on a specific valuation of the property stolen. Or consider the federal crimes of bank robbery, 18 U.S.C. § 2113(a), and armed bank robbery, 18 U.S.C. § 2113(d). In such cases, the additional fact that distinguishes between two different crimes (or degrees of crime), authorizing more punishment for one than for the other, must always be proved to a jury beyond a reasonable doubt. This Court knows of no case in which a court confronted a claim that, once guilt of a lesser crime had been found beyond a reasonable doubt by a jury, a judge could simply declare the defendant guilty of more serious offenses and impose punishment *beyond the maximum sentence prescribed for the lower-grade offense,* based on the judge's own determination that the facts justified convictions of more serious crimes. Presumably, no prosecutor had ever dared to make such a claim.

*Apprendi* holds no more than that the same rule applies where the legislature, rather than defining a specific separate crime of, for instance, grand larceny or armed bank robbery, defines only the lesser offenses, and then provides in a separate *general* statute that the statutory maximum sentence will be increased for *all* crimes in which the harm to the victim exceeded a certain dollar value, or in which

the perpetrator used a weapon. To permit a legislature to authorize the judge to determine facts that subject the defendant to punishment beyond the maximum sentence for the offense of conviction under such a general rule would effectively preempt the jury by creating a more serious category of crime, with a more serious punishment, of which a defendant could be convicted without a jury finding of guilt of the elements of the more serious offense.[15]

As compared to the statute at issue in *Apprendi,* however, sentencing guideline systems seem more analogous to the kinds of fact-finding that judges historically performed under discretionary sentencing regimes, and less comparable to the creation of innumerable degrees of separate crimes. As the dissenters in *Blakely* argued, if judges historically could determine facts that affected where, within the statutory maximum, a defendant would be sentenced, a practice the majority agreed was constitutional, *see Blakely,* 124 S.Ct. at 2540, it is difficult to understand why that power becomes an unconstitutional intrusion on the jury's province once the legislature, or a sentencing commission, seeks to limit the factors a judge may consider. *See id.* at 2557–59 (Breyer, J., dissenting). As the Supreme Court said in sustaining the Guidelines against a different constitutional attack, the Guidelines "do no more

---

**15.** One might have thought, though the question is obviously closer, that establishing a mandatory minimum sentence where a particular factor is present would require a similar analysis. The difference between a crime with a statutory sentencing range of 0–20 years, and one with a statutory sentencing range of 5–20, would seem as morally fraught as that between a crime with a range of 0–20, and one with a range of 0–25, and more practically important to more defendants. But the relative novelty of mandatory minimum sentences, and the traditional division of degrees of crime based on increases in the *maximum* sentence (in addition to or instead

of the imposition of a minimum sentence) make this a closer question. Thus, despite Justice Thomas's quite persuasive argument that *Apprendi* requires juries to find factual elements that trigger mandatory minimum sentences, *see* 530 U.S. at 499–523, 120 S.Ct. 2348 (Thomas, J., concurring); *see also Harris v. United States,* 536 U.S. 545, 572–83, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) (Thomas, J., dissenting), the Court, notwithstanding *Apprendi,* adhered to the holding of *McMillan* that a judge alone may decide the facts bearing on mandatory *minimum* sentences. *Harris,* 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524.

than fetter the discretion of sentencing judges to do what they have done for generations—impose sentences within the broad limits established by Congress." *Mistretta v. United States,* 488 U.S. 361, 396, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

Before the Guidelines, for example, most judges presumably thought that a defendant who perjured himself at trial should be sentenced more severely than one who did not. The Court had upheld the judge's power to take that factor into account in imposing a sentence, which perforce meant that the judge would determine as a matter of fact whether the perjury had occurred. *See United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978). The Guidelines did not affect the judge's or the jury's fact-finding powers in this situation; they simply directed judges who had a different sentencing philosophy to get in step with their colleagues and consider this factor. The Supreme Court reaffirmed the constitutionality of this age-old fact-finding practice, in light of the new guideline directive, in *Dunnigan,* 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445. Of course, the Guidelines thereby limited the discretion of judges to enhance or not enhance a sentence they would otherwise find appropriate in light of a defendant's obstruction of justice. They did not, however, change the legislatively-prescribed maximum punishment for any crime. Nor did they affect the jury's role in determining guilt (absolute) or its role in determining punishment (none at all, within the prescribed statutory range). The allocation of fact-finding power between judge and jury has remained the same; what has changed is the allocation of *rule*-making power between the individual judge and the legislature and its delegate, the Sentencing Commission.[16]

Accordingly, this Court, while in full agreement with the majority's opinion in *Apprendi,* would have no difficulty upholding the Guidelines as consistent with that decision. Of course, this Court's thoughts about *Apprendi* are irrelevant if the Guidelines are inconsistent with the Supreme Court's more recent pronouncement in *Blakely.* But it is not at all clear that *Blakely* controls this case.

*Blakely* concerned a sentence imposed under the law of the State of Washington. Blakely had been convicted of second-degree kidnaping, which carried a maximum sentence of ten years. *Blakely,* 124 S.Ct. at 2535. But Washington's Sentencing Re-

**16.** Unquestionably, one can imagine legislative enactments that *would* co-opt the jury's role by completely restructuring traditional crime definitions to impose very high maximum punishments for very minimally-defined criminal acts (say, a maximum of life imprisonment for conduct that harmed another, intentionally or otherwise), and then left issues that traditionally had defined very different offenses for resolution at sentencing by the judge (for example, whether the defendant caused serious injury or death, used a weapon, or inflicted the harm intentionally, recklessly or negligently). While some judges might find drawing the line between such a radical undermining of the jury system and a system that substitutes guided for unguided discretion within traditional sentencing categories uncomfortably subjective, most of those who have sat on the Supreme Court throughout its history would find such an exercise the essence of the judicial role, much like distinguishing between reasonable and unreasonable searches, cruel and not-so-cruel punishments, speedy and unduly delayed trials, or reasonable and unreasonable time, place, and manner restrictions on freedom of speech, among many other examples. Such line-drawing, even if at the borders it must inevitably draw on the individual judgment of appointed judges, is infinitely preferable to applying formulaic rules in defiance of common sense or practical effect. For purposes of this case, it is sufficient to note that the Guidelines do not remotely constitute such a radical reworking of traditional approaches to defining crimes.

form Act provided a "standard range" of punishment for that offense of 49 to 53 months, which could be increased only if the judge found "substantial and compelling reasons" for an "exceptional sentence." *Id.* The Court said "that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* ... In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." *Id.* at 2537 (emphasis in original).

Taking this *language* literally, it is difficult to see how the provisions of the federal Guidelines that permit Emmenegger to be sentenced to more than six (or at most 10) months can be meaningfully distinguished from the State of Washington's sentencing system, at least as the Supreme Court described that system in its opinion. But *Blakely*'s *holding* remains limited to the Washington system. The question, properly conceived, is therefore not whether the federal guidelines regime can be squared with particular language in *Blakely,* such as its definition of "statutory maximum"; it is whether *Blakely*'s holding, which the Court expressly limited to the facts before it, that is, those pertaining to Washington's particular sentencing scheme, perforce invalidates the quite distinct federal guidelines regime. Heedlessly applying the Court's language outside the context in which it was written ignores significant distinctions between the Washington and federal systems.

First, as a matter of form, in the context of Washington law, it made sense to speak of the "standard sentencing range" as a *statutory* maximum, because a statute literally created that range. Washington ar-

guably muddled the already dubious distinction between "offense elements" and "sentencing factors," even as a formal matter, by adopting (by means of the statute setting the "standard sentencing range" a *statutory* maximum punishment for "ordinary" second-degree kidnaping, with an increase in that punishment, as in *Apprendi,* turning on a judge's rather than a jury's finding of fact.) The federal system does not impose its rules by statute, but by regulatory guidelines.

Second, and more significantly, it makes sense in a substantive as well as a formal way to describe the "standard sentencing range" in *Blakely* as the maximum punishment for that crime. The range is closely tailored to the specific elements of a narrowly-defined crime, and the aggravating factor cited by the judge overlaps almost entirely with the very factor that distinguishes those elements from those of first-degree kidnaping, an entirely distinct crime. The argument that this is indistinguishable from *Apprendi,* while not indisputable, has much to recommend it.

Within the context of the Guidelines, however, it makes little sense to say that Congress intended the "statutory maximum" sentence for the crime of wire fraud to be six months rather than the twenty years to which Congress, subsequent to the adoption of the Sentencing Reform Act and the effective date of the Guidelines, increased the actual statutory maximum sentence for that crime. Unlike most state penal codes, which frequently divide crimes into narrow degrees and standard categories often patterned on the highly rationalistic Model Penal Code, federal criminal statutes typically cover a vast range of behavior in undifferentiated, very general formulations. The wire fraud statute is a classic example of such a statute, which quite literally covers a multitude of sins of quite different kinds and degrees.

Unlike many state guideline systems, the federal Guidelines do not set a "standard sentencing range" for the crime of wire fraud, or for most other crimes of conviction. Rather, the Guidelines provide a methodology for assessing the seriousness of different instances of crime, quite separate from the elements of any particular statutory crime. Where it may make sense to think of the 49—53 month "standard sentencing range" as the operative ordinary maximum punishment for kidnaping in the second degree in Washington, the federal Guidelines defy any effort to identify a "standard sentencing range" (or a "statutory maximum" other than the one literally provided by 18 U.S.C. § 1343) for wire fraud. The system simply does not work that way.

Whether the Supreme Court will find these distinctions persuasive is not for this Court to predict. Like the dissenters in *Blakely,* this Court would likely have seen the Washington system, which is only cursorily described in the Supreme Court's opinion, as falling (with respect to the intrusion on jury prerogatives) close enough to traditional discretionary sentencing, and far enough from the problematic statute in *Apprendi,* to pass constitutional muster, and the Supreme Court's rejection of the dissenters' arguments inspires little confidence that the majority will reach a different view of the federal system. But the question is one of line-drawing, and the Guidelines fall sufficiently far from the failings condemned in *Apprendi* that this Court remains convinced of their constitutionality.

III. *Severability*

One thing does seem certain, however. If it is unconstitutional for the Court to apply sentencing guideline enhancements based on fact findings that go beyond the facts admitted by the defendant at his plea, the entire structure of the Guidelines must fall. At least as applied to defendants in Emmenegger's position, the fact-finding system of the guidelines regime, for reasons eloquently discussed by several judges who are thoughtful students of sentencing,[17] is inseparable from the substantive guideline provisions that it applies. Just as it makes no sense to consider the "base offense level" for wire fraud offenses, which imposes a presumptive sentence of 0—6 months, the "statutory maximum" for wire fraud, it makes even less sense to conclude that had Congress known that the fact-finding system assumed and directed by the Guidelines would be held unconstitutional, it would have wished this Court to impose such a minimal sentence on a defendant who pleaded guilty to the bare elements of wire fraud under the circumstances at bar. The Guidelines themselves, U.S.S.G. § 1A1.1, Editorial Note, Ch. 1, Part A, § 4(a), and the authoritative discussion by one of their principal draftsmen, Stephen G. Breyer, *The Federal Sentencing Guidelines and the Key Compromises on Which They Rest,* 17 Hofstra L.Rev. 1, ·12–13 (1988), make clear that the entire substantive system of the Guidelines rests on a determination that the *judge* should make findings required by a "modified real offense" sentencing system that distinguished the facts relied upon in sentencing from the elements of the "offense of conviction" found by the jury. To impose the one without the other would require, in many cases, including the present one, either radically lenient sentences completely

---

17. *See United States v. Mueffleman,* 327 F.Supp.2d 79, 90–94, No. 01–CR–10387, 2004 WL 1672320, at *8–*11 (D.Mass. July 26, 2004) (Gertner, J.); *United States v. Croxford,* 324 F.Supp.2d 1255, 1259–61 (D.Utah 2004) (Cassell, J.); *but see Ameline,* 376 F.3d at 981–82 (holding that procedural aspects of the guidelines regime are severable).

**436**

at odds with the intentions of Congress and of the Sentencing Commission, or the creation out of whole cloth of a system of sentencing-jury trials that would not only be impractical, but that would, more importantly, be completely unauthorized by any constitutional provision, statute, judicial precedent or tradition.[18]

## IV. Summary and Conclusion

■ This Court will continue to apply the Guidelines in imposing sentence in pending cases, unless and until instructed to do otherwise by the Supreme Court or the Second Circuit. Binding Circuit case law holds that the guideline fact-finding system is consistent with the constitutional right to a jury trial as interpreted in *Apprendi*, and this Court is obliged to follow that precedent until it is overruled by a higher court or until Supreme Court precedent renders it untenable. That point, while perhaps imminent, has not arrived. This Court believes that the Second Circuit's conclusion was and is correct. This view may be difficult to reconcile with some of the language of *Blakely*, but the inconsistency between that language and prior Supreme Court precedent interpreting the Guidelines, the existence of significant potential distinctions between the federal Guidelines and the system rejected in *Blakely*, and the Supreme Court's specific reservation of the question of the constitutionality of the federal Guidelines, combine to compel the conclusion that *Blakely* does not so thoroughly undermine *Luciano* as to authorize this Court to depart from that otherwise-binding precedent.

Nevertheless, given the significant constitutional doubt cast on the Guidelines by *Blakely*, the Court will in all future cases announce its alternative view of an appropriate sentence if the Court has discretion to impose sentence within the statutory maximum. This will conserve resources in the event that the Supreme Court finds the Guidelines unseverably unconstitutional. Judicial economy is better served by considering the sentence that would be imposed as a matter of judicial discretion at the time the Court has studied the case in depth in preparation for sentencing, rather than revisiting that question, perhaps months later, in the event the case is remanded for resentencing after the Supreme Court determines the authoritative answers to the questions considered in this opinion.

## CONCLUSION

The Court will impose a sentence of 33 months' imprisonment, the minimum of the range dictated by the Guidelines.

SO ORDERED.

**18.** A different severability issue, whether the Guidelines, if unconstitutional in cases in which the intended guideline sentence depends crucially on enhancements based on judge-determined facts, would still be constitutional in cases in which the guideline sentence requires no such enhancements, is not presented by the case at bar.