**UNITED STATES of America,**

v.

**Suif JACKSON, Defendant.**

**No. 04 Cr. 340(GEL).**

United States District Court, S.D. New York.

Sept. 23, 2004.

Daniel M. Gitner, Helen V. Cantwell, Assistant United States Attorneys, New York, N.Y. (David N. Kelley, United States Attorney for the Southern District of New York, of counsel), for the United States of America.

Mark P. Goodman, Ellen A. Hochberg, Debevoise & Plimpton, LLP, New York, NY, for defendant Suif Jackson.

## SENTENCING OPINION

LYNCH, District Judge.

This case presents sentencing issues that demonstrate the occasional complexity of the federal Sentencing Guidelines. Although the intricacies of the guideline application here are interesting and significant in themselves, the case also illustrates aspects of the Guidelines that are of crucial relevance to both the constitutional questions currently under consideration by the Supreme Court, and to questions of sentencing policy that should be of concern to the Commission and the Congress.

## BACKGROUND

The defendant Suif Jackson stands convicted, by his plea of guilty, of four felonies involving firearms: possession of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1); possession of a machine gun, 18 U.S.C. § 922(o); transportation of an unregistered machine gun in interstate commerce, 26 U.S.C. § 5861(j); and possession of an unregistered machine gun, 26 U.S.C. § 5861(d). All four felonies carry maximum sentences of ten years' imprisonment, and all involve a single weapon, a fully automatic Mac–11 machine gun, which was transported and possessed by Jackson on a single day, February 25, 2001.

The undisputed facts underlying this conviction are frightening. Jackson admitted in his plea allocution that he brought a machine gun from Englewood, New Jersey to Manhattan, and fired it during an altercation near the studios of a radio station. While pleading guilty, he stated under oath that he fired the gun at someone, and believes that he hit that person. (He expressed some uncertainty about whether he himself actually wounded anyone, apparently because other people were firing at the same time.) (Tr. 21–22.)

Additional facts, which Jackson does not dispute but which he did not specifically admit to at the time of his plea, provide a context for this event. Jackson was a friend and sometime bodyguard for a well-known recording artist named Kimberly Jones, professionally known as "Lil' Kim," and came to the radio station with her on the day in question. Immediately following Jones's interview at the station, another singer (professionally known as "Capone"), with whom Jones apparently had some sort of rivalry or feud, was scheduled to arrive. According to Jackson's post-arrest statement to the authorities, Jackson had words with Capone. The confrontation escalated, and Jackson eventually fired twenty to twenty-two shots. (PSR ¶¶ 23–41.) It is not disputed that others were firing too, and Jackson testified at his allocution, without contradiction by the Government, that "[p]eople were firing at me too." (Tr. 21.) A person apparently associated with the Capone faction was shot in the upper back and seriously wounded. (PSR ¶ 44.) The Presentence Report ("PSR") states, and Jackson does not dispute, that Jackson was responsible for this injury. (PSR ¶ 33.)

Exactly how the altercation escalated from words to shooting is not clear from the record currently before the Court. Since Jackson was charged only with offenses involving the possession and trans-

portation of the firearm, he could and did fully acknowledge his guilt on those charges without setting forth a detailed account of who fired when, or what he perceived, believed, or felt at the time of the shooting. While he acknowledged firing the machine gun at someone, he noted that others were firing too, including some who were firing at him. His postarrest statement, as reported in the PSR, also notes that "he fired and others fired too," without specifying who fired first or what the circumstances were. (PSR ¶ 41.)[1] Neither in his allocution nor in the post-arrest statement as reported in the PSR does Jackson specifically claim to have acted in self-defense; neither, however, does either statement specifically admit that he was the aggressor. In his post-conviction, pre-sentence interview with the probation department, Jackson stated that he "returned fire" after "[a] gun was fired from [Capone's] group" when "there were people shooting at him." (PSR ¶¶ 46, 48.) A sentencing submission by Jackson's attorneys adopts and elaborates this account, asserting that "Jackson did not initiate the shooting. He fired his weapon only after hearing gunshots from the rival group, and only in response to their attack." According to defense counsel, "Jackson's decision to fire his weapon was not an act of naked aggression but, rather, of instinctual self-defense." (Letter of Mark P. Goodman and Ellen A. Hochberg to the Court, dated September 20, 2004 ("Defense Letter"), at 2.)[2]

The Government characterizes the incident differently, stating that "[a]fter the other artist arrived at the radio station, Jackson and [another member of Jones's party] began firing guns." (Letter from AUSAs Helen V. Cantwell and Daniel M. Gitner to the Court ("Government Letter"), dated September 20, 2004, at 2.) It is not entirely clear, however, that this extremely cursory summary of the events, which does not refer at all to any shooting from the rival party, purports to assert that Jackson was the aggressor, or to dispute the account that members of that group did in fact fire, whether before or after Jackson fired his weapon. In support of its characterization, the Government cites only to paragraphs of the PSR that, as fully described above, state in very summary fashion that Jackson "emptied the clip from [his] machine gun ... into the crowd." (Government Letter at 2, citing PSR ¶¶ 33, 41.)

As further context for these events, the PSR sets forth in detail Jackson's dismal criminal history. To those familiar with the Guidelines, the numerical summary of that history will be sufficiently startling: Jackson has accumulated fourteen "criminal history points," placing him in Criminal History Category VI—the highest category recognized in the guideline system. In ordinary English, this score reflects five previous convictions (none relating to the incident now before this Court) for sale of narcotics, criminal possession of a weapon (twice), attempted robbery, and robbery, from 1988 through 2001. Four of those offenses involved handguns, three involved at least threats of violence, two involved firing a gun, and in one Jackson wounded someone. Jackson has been in prison, or

---

1. The PSR's account is filtered through two witnesses, being derived from the probation officer's review of law enforcement agents' reports describing Jackson's statement, and does not purport to report Jackson's own words in full or verbatim.

2. While defense counsel attribute this conclusion to the PSR, nothing in the probation officer's report adopts that view of the incident, and counsel's characterization actually goes somewhat beyond even what Jackson is reported to have claimed in his interview. (PSR ¶ 46.)

on probation or parole, nearly continuously since 1988. Whenever he has received leniency from the courts or from the authorities, he has betrayed that trust: His second conviction occurred while he was on probation for his first; he has been paroled from prison three times, and each time his parole has been revoked. Jackson, in fact, is now serving a state sentence for the last of these crimes, which took place after the incident at bar, but which preceded his arrest on the present charges.

## DISCUSSION

On these facts, no judge in the United States would need sentencing guidelines of any kind to decide that a lengthy sentence is appropriate and required, in order to punish Jackson for an extremely serious offense, and to protect the public from a man who has proved himself extremely violent and dangerous. This is not to say, of course, that guidelines are of no assistance to the Court. Reasonable minds can differ about what constitutes a "lengthy" sentence for a thirty-four-year old offender with a fifteen-year history of violent crime, who has committed an offense of this nature. A guidepost that indicates whether "lengthy," in just proportion to other crimes and in keeping with the consistent practices of courts throughout the country, will generally mean five years, or ten, or fifteen, subject to more specific tailoring to the conditions of the particular case, provides valuable assistance in avoiding sentencing disparity among different judges.

As is well known, however, the federal Sentencing Guidelines attempt not merely to provide such guidance, but to dictate, within extremely narrow limits, a highly specific sentence for every defendant who comes before the federal courts. Given that ambition, the Guidelines must attempt to address the details of the nearly infinite variety of human wickedness and individual circumstance. As the Supreme Court has recognized in *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), this effort can involve the courts in making factual findings that may implicate our constitutional commitment to trial by jury.

The guideline calculation in this case illustrates both the complexity of the system that follows from its excessive detail and the constitutional awkwardness of at least certain provisions of the Guidelines that require sentencing judges in effect to declare defendants guilty of crimes of which they have not been convicted by a jury. At the same time, the case illustrates why simplistic analysis of "the constitutionality of the Guidelines in light of *Blakely*," which purports to find the entire system unconstitutional, radically oversimplifies a complicated and diverse sentencing system which in many of its aspects presents no constitutional difficulties at all.

I. *The Plea Agreement and PSR: U.S.S.G. § 2A2.1*

Although not every provision of the Guidelines is difficult to apply, in some cases the Guidelines present technical difficulties that challenge even talented lawyers and experienced probation officers. In this case, the parties and the PSR appear to have misapplied the Guidelines, in a way that maximizes the potential constitutional problems of guideline sentencing.

Without question, the guideline provision applicable to this case is U.S.S.G. § 2K2.1, which applies to "Unlawful Receipt, Possession or Transportation of Firearms or Ammunition." This provision, however, contains a "cross-reference" which considerably complicates this case. Under U.S.S.G. § 2K2.1(c)(1)(A):

If the defendant used or possessed any firearm ... in connection with the commission or attempted commission of another offense, ... apply ... § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above.

With respect to this offense, the parties have stipulated in a plea agreement that this provision applies, and that § 2X1.1, on the facts of this case, in turn refers the Court to the guideline for "Assault with Intent to Commit Murder," U.S.S.G. § 2A2.1. (*See* Letter of AUSAs Helen V. Cantwell and Daniel M. Gitner to Joseph Bianco, Esq., dated June 10, 2004 ("Plea Agreement"), at 2.) [3]

According to the parties' stipulation, this Guideline provides a base offense level of 28 for the instant offense, because "the object of the offense would have constitut-

ed first degree murder." U.S.S.G. § 2A2.1(a)(1).[4] In light of *Blakely*, this assertion raises an immediate concern. Jackson pled guilty to possession and transporting a machine gun, a serious offense in its own right. The structure of the Guidelines, however, apparently requires the Court to consider whether he is guilty of the far more serious offense of attempted first-degree murder, an offense with which he has never been charged, let alone convicted by a jury.[5] Whatever one thinks about the general constitutionality of the federal guideline sentencing system, *see United States v. Emmenegger*, 329 F.Supp.2d 416 (S.D.N.Y.2004) (distinguishing *Blakely* and finding Guidelines constitutional in general and as there applied), it is unsurprising that fair-minded jurists would be troubled by the notion that Jackson could in effect be sentenced for such a serious offense based on a finding of guilt by a judicial officer rather than a jury,

**3.** By its own terms, this plea agreement, while binding the parties not to advocate for a different sentence than the one set forth in their stipulation, does not bind the Court, which is obliged to make its own independent calculation of the appropriate application of the Guidelines. (Plea Agreement at 5; Tr. 20.)

**4.** If this Guideline applies to this case, the Court is obliged to apply it; the Court may not depart from the guideline sentence because of disagreement with the judgment of the Sentencing Commission or the Congress. It is worth noting, however, that the offense levels in federal sentencing law are sometimes perplexing. Under § 2A2.1, a violent criminal who attempts, with premeditated malice, to kill another human being, and succeeds in inflicting serious bodily injury (*see* § 2A2.1(b)(1)(B)) is assigned an offense level of 30, which for a first offender results in a presumptive sentence of 97–121 months, reduced to 70–87 months, that is, 6–7 years. A first offender who sells *50 grams* of crack cocaine (worth roughly $1200 on the streets of New York, *see United States v. Perez*, 321 F.Supp.2d 574, 576 (S.D.N.Y.2003)) is assigned an offense level of 32 (121–151

months), U.S.S.G. § 2D1.1(c), and must receive a mandatory sentence of 10 years in prison, whether or not he pleads guilty. 21 U.S.C. § 841(b)(1)(A). A similar mandatory sentence of 10 years applies to someone who tries to obtain child pornography through the mails, even if he never actually receives any pornographic material and has never harmed anyone. 18 U.S.C. § 2252A(3)(B). The Guidelines treat efforts to take human life quite leniently as compared to these other offenses.

**5.** Indeed, Jackson never could be charged with this offense. Assuming for the sake of the argument that Jackson's actions fulfilled the substantive requirements for attempted first-degree murder under federal law, 18 U.S.C. §§ 1111, 1113, there is no basis whatever for the assertion of federal jurisdiction over his crime. Under New York law, however, first-degree murder is defined differently from the traditional premeditation formula applied under federal law and presumably referenced in the Guidelines, and there can be no contention that Jackson is guilty of attempting the crime so defined in the New York Penal Law. *See* N.Y. Penal Law § 125.27.

based on a preponderance of the evidence rather than proof beyond a reasonable doubt, after a relatively informal fact-finding procedure without the guarantees provided in a traditional trial.

It should also be apparent, even to a first-year law student, that the evidentiary record before the Court is completely insufficient to establish Jackson's guilt of attempted first-degree murder. Indeed, the record is not clearly sufficient to determine whether he is guilty of any assault or homicidal offense at all. To find a person guilty of attempted murder, let alone of attempted murder in the first degree, requires a detailed inquiry into the state of mind and circumstances of a killing, which the casual characterizations of the parties here do not even begin to make possible.

Murder, under federal law, "is the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111. While "malice" in the context of the common law from which this formulation derives is a famously elusive term of art,[6] it minimally requires a certain degree of mental culpability. Under New York law, a killing is not murder unless (putting aside categories not relevant here) the defendant acted with the intent to kill another, N.Y. Penal Law § 125.25(1), or with recklessness (defined as actual awareness of and conscious disregard for a substantial and unjustifiable risk of causing death, *see* N.Y. Penal Law § 15.05(3)) amounting to a "depraved indifference to human life," N.Y. Penal Law § 125.25(2). Federal law is less clear about the precise mental state required, but some courts appear to have interpreted malice to require at least a finding of recklessness, though perhaps at a lesser

level than that required in New York. *See, e.g., United States v. Milton,* 27 F.3d 203, 208 (6th Cir.1994) (finding malice where defendant "must have been aware of a risk of death or serious bodily injury," and committed acts constituting a "gross deviation from a reasonable standard of care"); *United States v. Black Elk,* 579 F.2d 49, 51 (8th Cir.1978) ("Malice may be established by evidence of conduct which is 'reckless and wanton, and a gross deviation from a reasonable standard of care, of such nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm.'") (quoting *United States v. Cox,* 509 F.2d 390, 392 (D.C.Cir.1974)).

Even assuming that malice could be found, however, further inquiries would be required. First, first-degree murder, which must be found for the parties' guideline calculation to be correct, requires *more* than mere malice. Murder is classified as first degree under federal law when it is committed in the course of various felonies not relevant here, or when it is "perpetrated by poison, lying in wait, or any other kind of wilful, deliberate, malicious, and premeditated killing." 18 U.S.C. § 1111. Distinguishing killings committed merely with "malice" or intention to kill from those committed with deliberation and premeditation is another famously difficult task; the distinction was so "obscure and mystifying" that no less a jurist than Cardozo pronounced himself unable to understand it. Benjamin N. Cardozo, *What Medicine Can Do for Law, in Law and Literature* 70, 101 (1931).

**6.** The great judge and criminal law scholar Sir James Fitzjames Stephen once derided the term as a cover for ad hoc judicial classifications: "the loose term 'malice' was used, and then when a particular state of mind came to their notice, the Judges called it 'malice' or not, according to their view of the propriety of hanging particular people." *Quoted in* Sanford H. Kadish & Stephen J. Schulhofer, *Criminal Law and Its Processes* 389 (7th ed.2001).

Second, even an intentional killing may turn out to be less than murder, if it is committed "[u]pon a sudden quarrel or heat of passion." 18 U.S.C. § 1112. Determining whether a killing falls within this category requires an inquiry into whether the killing was committed in the heat of passion brought on by such provocation as would be adequate to arouse a reasonable person to a high degree of fear or rage such as would mitigate his actions. *See, e.g., United States v. Paul,* 37 F.3d 496 (9th Cir.1994); *cf.* N.Y. Penal Law §§ 125.20(2), 125.25(1)(a) (defining intentional killing as manslaughter when committed "under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse").

Finally, even an act committed with intent to kill may be justified when it is committed under circumstances permitting the use of deadly force in self-defense. The law of self-defense presents its own extremely complicated set of questions, including such matters as whether the defendant reasonably feared that he was confronted with the imminent use of unlawful force by another, whether that force was reasonably believed to threaten death or great bodily harm, who was the initial aggressor, and whether retreat was possible. See N.Y. Penal Law § 35.15 for one statutory formulation of these complex rules, which very likely differs in various respects from the less precisely formulated common-law rules followed by the federal courts.

The facts available to the Court do not remotely permit these matters to be authoritatively determined. It is apparently disputed whether Jackson acted in self-defense; the defense claims that he did, while the Government seems to believe otherwise. Even the basic fact of whether Jackson was the first to fire is not clear from the evidence presented to the Court.

But even if that fact could be established, determining whether Jackson acted in self-defense would require a more nuanced inquiry into the circumstances under which he fired his gun. Even if he fired first, he might have a defense if he reasonably believed that Capone or one of his entourage was imminently about to attack him with deadly force; even if he fired second, he could conceivably lose his defense if he was the initial aggressor in the altercation or if he had a reasonable alternative to using deadly force in return. None of the facts necessary to make such a determination is presented in the PSR or the parties' submissions. Not even Jackson's own account of whether he claims to have been in fear of his life is expressly stated anywhere in this record.

■ Similarly, even assuming it could be established that Jackson's use of deadly force was unjustified, the materials before the Court do not come close to establishing the degree of his culpability. It is possible that Jackson brought the machine gun from New Jersey with the premeditated intention of killing Capone, but nothing in the present record points toward such an inference. Of course, premeditation might have occurred more shortly before the gun was fired, but the record leaves the Court without insight into what Jackson was thinking during the altercation, and without sufficient facts to permit a very persuasive inference about it. Indeed, it is unknown, and unknowable without a much deeper inquiry, whether Jackson intended to kill anyone at all, or whether he merely fired wildly in a state of panic. Such a mental state could still constitute malice, sufficient to make his crime murder if someone had been killed. *See Milton,* 27 F.3d 203. But Jackson's shooting did not result in death, and is charged as an attempt. Attempts under federal law require "that the defendant had the intent to

commit the crime" allegedly attempted. *United States v. Yousef,* 327 F.3d 56, 134 (2d Cir.2003); *United States v. Crowley,* 318 F.3d 401, 408 (2d Cir.2003). An attempted reckless murder, in the conventional understanding of the law, is a logical impossibility.

Moreover, even if it could be established that Jackson deliberately attempted to kill Capone or someone else, under circumstances that did not provide a self-defense justification, the circumstances might very well reduce the crime to attempted manslaughter, since the facts clearly lend themselves to the argument that Jackson acted "[u]pon a sudden quarrel" rather than with any more thoughtful or malicious intent. Whether such a conclusion is warranted would depend upon a much fuller inquiry into the words and actions of the parties to the altercation, and the mental or emotional reactions of Jackson to those events, than the skeletal recital in the PSR and in the parties' presentations.

Of course, the fact that the material now available to the Court does not permit these findings does not mean that they could not be made. The Court could convene a factual hearing into the events of February 25, 2001, and in effect conduct a trial of Jackson on charges of attempted first-degree murder. A sentencing system that required such a trial would be absurd as a matter of policy, and would trigger precisely the constitutional concerns that moved the Supreme Court in *Blakely.*

It is not for nothing that questions of this sort, when tried in the context of homicidal offenses, are tried to a jury. The distinctions between first- and second-degree murder, and earlier between murder and manslaughter, entered the law as ways of deciding who merited capital punishment. In that context, subtle distinctions in the law are important, and it is critical (and constitutionally required) that such distinctions be applied by the jury as representatives of the community. To conduct such a trial, and decide that a defendant such as Jackson is "really" guilty of one of the most heinous offenses in the penal code, without utilizing the full panoply of procedural protections applicable in criminal trials, is offensive, and at a minimum should give pause for constitutional reflection.

On the other hand, to require such a trial in the more limited context of a sentencing for the lesser offense of possession of a weapon would be remarkably inefficient. As noted at the outset, any reasonable sentencing judge would unquestionably find that Jackson merits a substantial sentence, regardless of how a hypothetical attempted murder trial would come out. Such a trial would consume large quantities of desperately needed law enforcement resources, in the form of the time of prosecutors, agents, and defense attorneys (who, due to Jackson's indigence, are being paid for by the taxpayer) to permit findings about arcane distinctions of mental state and factual circumstance that are of at most marginal relevance to the question of how severely Jackson should be sentenced.

■ Therefore, this Court will not attempt to conduct such a hearing. The Government and the defendant have presented the materials they apparently believe are sufficient to resolve the sentencing decision before this Court. As explained above, those materials do not support a finding that the defendant is guilty of attempted first-degree murder, or of attempted murder at all. Accordingly, there is no basis for applying U.S.S.G. § 2A2.1.

II. *The Guidelines for Possession of a Machine Gun*

The ordinary guidelines calculation for possession of firearms, without regard to

any effort to hold defendants liable for uncharged attempted homicides, provide for a sufficiently severe sentence, with no constitutional difficulty, and without the need for any remarkable fact-finding, at least if the Guidelines are interpreted with a proper regard for the flexibility and discretion built into them through the power of sentencing courts to depart from the prescribed guideline sentence for appropriate reasons.

■ First, the base offense level for this offense, without regard to the cross-reference to other crimes, is 26, pursuant to U.S.S.G. § 2K2.1(a)(1). That is a higher base offense level than for the ordinary felon in possession of a firearm, due to two aggravating factors: the offense involved a machine gun ("a firearm described in 26 U.S.C. § 5845(a)" in the language of the Guideline), and Jackson committed the offense after sustaining at least two felony convictions for crimes of violence or controlled substance offenses. That is the case here, since Jackson's criminal record (counting only convictions that preceded the present crime) includes convictions for attempted robbery in the first degree (PSR ¶ 67), and robbery in the third degree (PSR ¶ 69), which are both crimes of violence within the meaning of this Guideline.[7]

The factual findings necessary to apply this offense level present no constitutional problem, even on the broadest possible reading of *Blakely*. First, the fact that the gun in question was a machine gun is

an element of two of the counts to which Jackson expressly pled guilty, and he therefore admitted this element specifically, under oath, in connection with his guilty plea. (Tr. 21—22.) Second, the existence of a defendant's prior criminal record is exempted from the jury trial requirement announced in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which is the basis of the *Blakely* holding. *See Apprendi*, 530 U.S. at 487–88, 120 S.Ct. 2348 (distinguishing *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)).

■ That base offense level can be enhanced by four levels if "the defendant used or possessed any firearm . . . in connection with another felony offense." U.S.S.G. § 2K2.1(b)(5). For all the reasons set forth above, it is not clear whether Jackson's use of the machine gun constituted a felony under New York law. Accordingly, this provision is not applicable. Therefore, after applying the three-level reduction for acceptance of responsibility that both sides agree is applicable in light of Jackson's plea of guilty, U.S.S.G. § 3E1.1, the total offense level is 23. In combination with the defendant's undisputed criminal history category of VI, this offense level results in a guideline sentencing range of 92–115 months.

### III. *Departure*

■ The determination of the guideline sentencing range, however, does not end

---

7. Application Note 5 to U.S.S.G. § 2K2.1 provides that " '[c]rime of violence' has the meaning given that term in § 4B1.2(a) and Application Note 1 of the Commentary to § 4B1.2." U.S.S.G. § 4B1.2(a)(1) defines a "*crime of violence*" to include any offense punishable by more than a year in prison that "has as an element the use, attempted use, or threatened use of physical force against the person of another," and Application Note 1

extends that definition to include attempts to commit such offenses. All robbery offenses in New York include the use or threat of force, since all degrees of robbery involve "forcible stealing," defined as "us[ing] or threaten[ing] the immediate use of physical force upon another person" while committing larceny. N.Y. Penal Law § 160.00. *See also* N.Y. Penal Law §§ 160.05 (robbery in the third degree) and 160.15 (robbery in the first degree).

the matter. Under the Sentencing Reform Act of 1984, Pub.L. No. 98–473, 98 Stat.1987, sentencing courts have the authority, and indeed the obligation, to depart from the guideline sentencing range when "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b)(1). *See also* U.S.S.G. § 5K2.0(a)(1)(A). Such circumstances are present here.

■ At least two circumstances of the crime warrant an upward departure. First, the firearm here was not merely "possessed" or "transported," as is minimally required to violate the statutes in question. It was, as Jackson admitted at his guilty plea, actually *used* with hostile intent against another person. Second, the use of the firearm resulted in a serious injury to another person.

The Commission has specifically instructed sentencing courts that an upward departure from the prescribed sentencing range is appropriate "[i]f significant physical injury resulted" from the offense. U.S.S.G. § 5K2.2. The parties have stipulated that "a victim of the shooting sustained serious bodily injury." (Plea Agreement at 3.) That injury is not taken into account anywhere in the guideline calculation set forth above. Regardless of the correct answers to the complicated questions involved in determining whether Jackson is or is not guilty of some particular assault or homicide offense, there is no question at all that serious consequences resulted from Jackson's decision to bring a machine gun to New York on February 25, 2001. Those consequences were the natural and foreseeable result of Jackson's criminal conduct. Although all the events resulting in the gunplay on that date cannot be conclusively determined on the record before the Court (as fully discussed above), it is unquestionable that Jackson's possession of the weapon played a part in triggering the outbreak,[8] and clear by far more than a preponderance of the evidence (indeed, undisputed) that the victim would not have been injured had Jackson not fired.

These findings warrant an upward departure. The consequences of a crime matter in determining what the sentence should be. These facts, therefore, which as noted are not taken into account in calculating the guideline sentence, clearly "should result in a sentence different" from that which would be just in the case of the mere possession of a weapon without such consequences.

■ In determining the extent of the departure, the Court is mindful of the relative impact of such enhancing factors in connection with other guidelines. For example, in connection with the attempted murder guideline, an enhancement of two levels is provided where a victim sustains serious bodily injury. U.S.S.G. § 2A2.1(b)(1)(B). Similarly, in the Guideline for aggravated assault, the sentencing level is increased by three levels if a fire-

---

8. Regardless of who started the shooting, Jackson's possession of the machine gun surely affected his willingness to confront Capone (PSR ¶ 40), and defendant does not dispute the statement in the PSR that one of Capone's companions spotted Jackson's gun before the fight broke out (*id.* ¶ 41). Accordingly, even if someone in Capone's group began the shooting, it is more likely than not that Jackson's possession of a weapon contributed to the outbreak of violence. In any event, however, it is undisputed that Jackson's machine gun was the immediate cause of the victim's injury, and that this was a foreseeable consequence of Jackson's decision to arm himself illegally that day.

arm is brandished or its use threatened, but by five levels for its actual discharge. U.S.S.G. § 2A2.2(b)(2). That Guideline, moreover, provides for a two-level enhancement for infliction of bodily injury, and a four-level addition for "serious" bodily injury. U.S.S.G. § 2A2.2(b)(3)(A), (B). The logical inference from these provisions is that the use of the firearm and the infliction of injury should result in a departure that is the equivalent of several levels, that is, one that affects a significant increase but one that is small relative to the basic level of the offense.

It is not required, however, that departures be calculated with such precision. *United States v. Barresi*, 361 F.3d 666, 673—74 (2d Cir.2004). Departures, under the statute, are concerned with the *sentence* that "should result," not with the *offense level* that should apply. 18 U.S.C. § 3553(b)(1). In this case, an upward departure of approximately three levels would result in a sentencing range of 120—150 months. This seems to me an appropriate increase in the sentence in this case. Any possession of a machine gun is a very serious offense, and a sentence in the range of ten years, for someone with Jackson's record who possesses such a weapon, is a reasonable sentence in light of the general severity level created by the Sentencing Commission with the full approval of Congress. To add approximately an additional two years where that weapon is discharged and a person is injured is an appropriate enhancement.[9] Accordingly, the Court believes that a sentence of 144 months is appropriate in this case, and will depart upward to impose that sentence.[10]

The departure in question clearly involves the Court in finding certain specific facts. Those facts were, for the most part, admitted in Jackson's allocution, in which he stated that he fired the weapon at someone and "guess[ed]" that he hit that person. (Tr. 21.) Even to the extent that Jackson did not fully admit in the allocution that he caused serious injury, however, the finding that he did does not, in this Court's view, raise any plausible constitutional objection. The sentence to be imposed by the Court is well within the maximum statutory punishment available for the four offenses to which Jackson pled guilty.[11] The facts upon which the departure rests are not disputed by the defendant, and are the product of relatively simple factfinding. They are facts about the offense of conviction that are aspects of the aggravating or mitigating manner in which the offense was committed, and are

9. This is so even if Jackson's use of the weapon was arguably justified. First, on the present record the claim of justification is tenuous, and it is hardly likely that defendant could establish a full defense of his use of force if the matter were tried. Second, as already discussed, the issue here is not the justification or criminality of the use of force, but the consequences of the crime of which Jackson is confessedly guilty.

10. Notably, this sentence is within the range calculated by the PSR and provided for in the parties' plea agreement, based on an offense level of 27 (base offense of 28 under U.S.S.G. § 2A2.1(a), plus 2 for serious injury under U.S.S.G. § 2A2.1(b)(1)(B), minus 3 for acceptance of responsibility under U.S.S.G. § 3E1.1). However, the Court's calculation in effect arrives at a lower level, by applying a base offense level of 26 under U.S.S.G. § 2K2.1(a), minus 3 for acceptance of responsibility, with an upward departure of three levels, for a total of 26. Moreover, the ultimate sentence imposed will be lower than that sought by the Government and recommended by the PSR. This result appropriately reflects the Court's conclusion that the Government's and PSR's recommendations incorrectly treat Jackson as guilty of attempted first-degree murder.

11. Each offense carries a maximum of ten years' imprisonment, and the imposition of consecutive sentences are specifically authorized by statute. 18 U.S.C. § 3584(a).

not elements of some other or different offense. As such, they are the sort of facts traditionally found by sentencing judges in indeterminate sentencing systems of the sort specifically approved in *Blakely*. 124 S.Ct. at 2538. Moreover, in the case of a departure, the Court is exercising precisely the power to impose a sentence within the statutory maximum, unconstrained by any presumptive "right" of the defendant to a particular sentence provided by the guidelines, that led the Court in *Blakely* to characterize the sentence there as one in excess of a "statutory maximum." *Id.*, 124 S.Ct. at 2537–38, 2541. To the extent that the Guidelines provide for the exercise of such discretion, it cannot be said that they afford a "right" to the sentence provided by any particular base or total offense level. For these reasons, and for those set forth in *Emmenegger*, the finding of the facts supporting this departure does not infringe the right to a jury trial.

### IV. *Concurrent or Consecutive Sentences*

■ The parties extensively dispute whether the sentence imposed by the Court for this offense should be rendered concurrent with, or consecutive to, the state sentence Jackson is currently serving in connection with an unrelated shooting incident. (Government Letter at 3—7; Defense Letter at 1—3.) This matter is confided to the Court's discretion under U.S.S.G. § 5G1.3(c). After considering the various factors set forth in 18 U.S.C. §§ 3553(a) and 3584(b) as relevant to this determination, the Court concludes that it is appropriate to impose a consecutive sentence.

Several factors bear on this conclusion. The current offense is serious, and the defendant's record is one of continued violence and criminality. The need for a sentence to reflect the seriousness of the criminal conduct, and the need to protect the public, both counsel severity. Moreover, the state sentence was imposed based on an entirely independent crime, committed after the present offense. To impose a concurrent sentence would unjustly reduce the effect of the punishment imposed for that offense. Finally, the Court rejects defendant's effort to mitigate the criminal record in this case. (Defense Letter at 2.) His record is appalling, and the paltry efforts of the defense to identify favorable character traits (*id.*) only underscores his dangerousness. There is no basis for leniency in this matter.

### V. *Alternative Sentence*

In view of the constitutional questions raised by *Blakely* concerning the continued viability of the guideline sentencing system, it has been the practice of this Court since *Blakely*, despite sentencing in accordance with the Guidelines according to the directive of the Second Circuit, *see United States v. Mincey*, 380 F.3d 102 (2d Cir.2004), and its own conclusion that the Guidelines are constitutional, *Emmenegger*, 329 F.Supp.2d 416, to indicate as an alternative the sentence that the Court would apply if the Guidelines are found unconstitutional, and the Court is found to have discretion to impose any sentence within the prescribed statutory maximum, using the Guidelines solely as an advisory guide. It should be apparent from the preceding discussion, and from the fact that the sentence imposed represents an upward departure, that the Court would impose the same sentence in the absence of mandatory guidelines.

### CONCLUSION

The Court will impose a total sentence of 144 months' imprisonment, to run con-

secutively to defendant's current state sentence.

SO ORDERED.